



ORIGINAL

101 California Street
San Francisco, CA 94111-5802

1 | Andrew P. Bridges (SBN: 122761)
abridges@winston.com
2 | David S. Bloch (SBN: 184530)
dbloch@winston.com
3 | Nicholas Short (SBN:253922)
nshort@winston.com
4 | WINSTON & STRAWN LLP
101 California Street, 39th Floor
5 | San Francisco, CA 94111-5802
Telephone: (415) 591-1000
6 | Facsimile: (415) 591-1400

7 | Attorneys for Plaintiffs

8



**E-filing**

9 | **UNITED STATES DISTRICT COURT**

10

11 | **NORTHERN DISTRICT OF CALIFORNIA**

12 | INTERSERVE, INC. dba TECHCRUNCH, a ) Case No.
Delaware corporation, and CRUNCHPAD, )
13 | INC., a Delaware corporation, )
) **COMPLAINT FOR VIOLATION OF THE**
14 | Plaintiffs, ) **LANHAM ACT, BREACH OF FIDUCIARY**
) **DUTY, MISAPPROPRIATION OF**
) **BUSINESS IDEAS, FRAUD AND DECEIT,**
15 | vs. ) **AND UNFAIR COMPETITION**
)
16 | FUSION GARAGE PTE. LTD., a Singapore ) **DEMAND FOR JURY TRIAL**
company, )
17 | Defendant. )
)

18

19 | Plaintiffs allege as follows:

20 | 1. This case concerns the Defendant's wrongful conduct in pushing TechCrunch and

21 | CrunchPad, Inc. out of the "CrunchPad" project to which Techcrunch had invited the Defendant.

22 | The CrunchPad project sought to develop and market a low-cost, touch-screen based, tablet

23 | notebook computer that would rely upon a browser for operating system functionality and would

24 | primarily depend upon the World Wide Web for its applications.

25 | 2. TechCrunch conceived, initiated, developed, directed, and promoted the CrunchPad

26 | project. Moreover, Techcrunch supported the CrunchPad project with expertise, talent, oversight,

27 | energy, cash, and concrete contributions to the hardware and software development. On November

28

1
COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

1  17, 2009, "out of the blue," Defendant unilaterally cancelled the collaboration between itself and
2  TechCrunch, announcing that it was going to exploit for its own exclusive benefit all that the parties
3  had done together and cutting TechCrunch out of the project and its rewards. This litigation arises
4  from the Defendant's misconduct with respect to the project and the repudiation of the collaboration
5  that lay at its heart.

## THE PARTIES

7  3.  Interserve, Inc. is a Delaware corporation, with a principal place of business in this
8  District, that operates under the fictitious business name "Techcrunch." It has developed a
9  widespread reputation as a publisher of a network of technology-oriented blogs and other web
10  properties and as a sponsor of forums and conferences to highlight new technologies and the
11  companies that are spawning them.

12  4.  CrunchPad, Inc., is a Delaware corporation with a principal place of business in this
13  District. Michael Arrington formed CrunchPad, Inc. as an offshoot of Interserve, Inc. in order to
14  commercialize the CrunchPad project in conjunction with TechCrunch. This complaint uses
15  "TechCrunch" to refer to both Interserve, Inc. and CrunchPad, Inc.

16  5.  Techcrunch believes, and therefore alleges, that Fusion Garage Pte. Ltd. is a
17  Singapore company with its principal place of business in Singapore. TechCrunch believes, and
18  therefore alleges, that its status is analogous to that of a corporation under United States law.
19  TechCrunch believes, and therefore alleges, that Chandrasekhar Rathakrishnan, a Singapore
20  national, is the chief executive of Fusion Garage.

## JURISDICTION

22  6.  The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and
23  1338 because it arises under the Lanham Trademark Act and because the state-law causes of action
24  pertain to unfair competition and are joined with a substantial and related claim under the Lanham
25  Act. In the alternative, the Court has original jurisdiction over the action under 28 U.S.C. § 1332
26  because the action is between a citizen of a state and a citizen or subject of a foreign state and the
27  amount in controversy exceeds $75,000.

28

2
COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

1

**VENUE**

2  7. This District is a proper venue for the action because the Defendant resides within the

3 District within the meaning of 28 U.S.C. § 1391(c). In addition, a substantial part of the actions and

4 omissions giving rise to the action occurred within this District, including the physical presence of

5 Defendant through its agents with respect to the very actions that form part of the basis for this

6 action and including the conduct of, and dissemination, of a videoconference with false advertising

7 in this District..

8

**INTRADISTRICT ASSIGNMENT**

9  8. This action is not subject to intradistrict assignment because it involves claims under

10 intellectual property laws, namely the Lanham Act.

11

**FACTS COMMON TO ALL CAUSES OF ACTION**

12  9. TechCrunch holds an esteemed position in the technology world for providing

13 information and analysis concerning new technologies, the companies that produce and market them,

14 and the marketplace for those technologies and companies.

15  10. Michael Arrington is the founder and Editor of TechCrunch. TIME Magazine named

16 him one of the "100 most influential people in the world" in 2008.

17

**Chronology of the Overall CrunchPad Project and the Parties' Joint Efforts**

18  11. In July 2008, Mr. Arrington conceived of an opportunity for a device along the lines

19 of what the CrunchPad project aimed to create. On July 21, 2008, Mr. Arrington posted a challenge

20 to himself and to the world: "We want a dead simple web tablet for $200, help us build it." In the

21 announcement, he elaborated:

22  Here's The Plan

23  We'll organize a small team of people to spec this out. First is the marketing document that
just outlines what the machine will do – we have a first draft of that already and will post it

24  soon. Then we'll spec out the hardware and get people to help write the customized Linux
and Firefox code. Once we've completed the design we'll start to work with the supply chain

25  company to get an idea on the cost of the machine (the goal is $200), and hopefully build a
few prototypes. Anyone who contributes significantly to the project would get one of those

26  first prototypes. If everything works well, we'd then open source the design and software and

27  let anyone build one that wants to.

28

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

The goal is to keep the machine very simple and very cheap. I think this will be a lot of fun, and it may just turn into an actual product that we can use to surf the web and talk to our friends.

We'll be coordinating the project over at TechCrunchIT. Leave a comment there if you want to participate and we'll be in touch soon.

12. By August 30, 2008, TechCrunch had constructed its first prototype web tablet. Fusion Garage played no role in the development of that prototype. TechCrunch posted pictures and a description on the TechCrunch blog, referring to it as Prototype A. As Michael Arrington noted in the blog posting: TechCrunch was "still far from having beta units but there is now a team working on the project, and an incredible group of people and companies have reached out to us to help. We've learned a lot about building a hardware device over the last few weeks, and it's clear that it is quite possible to build a high performance web tablet in the price range we anticipated."

13. In September 2008 TechCrunch had also recruited Louis Monier to lead the project to build the CrunchPad. Mr. Monier was the founder and former CTO of AltaVista and had held positions at eBay, Google, and other high-performance Web- or technology-focused companies.

14. TechCrunch put on a widely publicized event called "TechCrunch 50" in San Francisco on September 8-10, 2008, which showcased new companies and technologies. During that event, Chandrasekhar Rathakrishnan of Defendant met an acquaintance of Michael Arrington, who later introduced Mr. Rathakrishnan to Mr. Arrington.

15. On September 23, 2008, Michael Arrington and Interserve's CEO Heather Harde met with Mr. Rathakrishnan and discussed the project. Later that day, Mr. Rathakrishnan wrote an email to Mr. Arrington saying that "[i]t was good meeting you and Heather today. I am excited about the possibility of working together and am looking forward to making this happen."

16. Defendant looked back on the beginning of its relationship with TechCrunch and its involvement in the project, describing it in a blog dated February 4, 2009 on its own web site as follows:

The collaboration with the Crunchpad project happened as a result of meetings we had with Mike Arrington and co, subsequent to TC50. We worked closely with Louis Monier in getting the software in shape for the hardware prototype B. We continue to work with them

4

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY, MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

in getting the software in shape to make crunchpad a easy to use device. This is where we stand as of prototype-B: (Details over at TechCrunch's update)

17. In recent weeks, Defendant has removed its blog from public display on its web site. TechCrunch believes and therefore alleges that Defendant did so in order to conceal from the public the true facts about the collaboration between TechCrunch and it. Although Defendant tried to erase the public record of the truth, the Google cache has preserved a record of the blog. Exhibit A is a copy of the Google cache of that blog

18. By January 19, 2009, the project had constructed a Prototype B, and TechCrunch started calling the device the CrunchPad.

19. In a post on its company blog dated January 19, 2009, Fusion Garage stated the following:

There is an air of excitement permeating through Fusion Garage at the moment. Michael Arrington of Techcrunch just wrote an update on the Techcrunch Tablet Prototype B.

It's our software that is running on the tablet as demonstrated in the videos embedded in the article. We continue to work with Louis Monier on the feature set and the user experience. We are thrilled with this progress and would like to take the opportunity to thank Michael and Louis for giving us the opportunity to work with them on the Techcrunch Tablet.

Its early days yet but we are big believers of the Browser As An Operating System and the Techcrunch Tablet Initiative.

A nice way to begin 2009 here at FusionGarage!

20. From April to July, 2009, Mr. Rathakrishnan worked with Techcrunch personnel in Techcrunch's offices in California on virtually a daily basis as part of the joint development of the project.

21. On April 9, 2009, photographs of a third prototype, called Prototype C, appeared online, quickly spreading to many different technology-interest websites. The website www.engadget.com, for example, shows some of the photos on a webpage dated April 9, 2009 and states "Leaked pics of the CrunchPad make it look dangerously close to availability."

22. On April 10, 2009, Michael Arrington posted on the TechCrunch blog that the collaboration was going well and that Fusion Garage had contributed significantly to the most recent

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY, MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

1   prototype, acknowledging that "this time the ID and hardware work was driven by Fusion Garage
2   out of Singapore" and that "[i]n fact, all the credit should go to Fusion Garage." Mr. Arrington's
3   statement graciously attributed the credit to Fusion Garage, but Fusion Garage had not done all the
4   work leading up to Prototype C. In fact, Prototype C was simply another iteration of earlier
5   prototypes and built upon the work and experience that came before it as well as the collaboration
6   that went into its development.

7       23.   On May 11, 2009, the parties created a joint presentation to potential investors that
8   identified the "Crunch Pad Team" as Michael Arrington (from TechCrunch), Chandrasekar
9   Rathakrishnan (from Defendant), Louis Monier (from TechCrunch), and Heather Harde (from
10   TechCrunch).

11       24.   On June 3, 2009, the Launch Prototype for the CrunchPad was ready. Mr. Arrington
12   and wrote on the TechCrunch blog: "A lot has happened behind the scenes, too. Our partner Fusion
13   Garage continues to drive the software forward, and we are in deep discussions with key partners to
14   bring the device to market."

15       25.   On June 16, 2009, because of Fusion Garage's financial straits, Mr. Rathakrishnan
16   asked TechCrunch to make payments on its behalf, stating "I need help with advancing some
17   payments for vendors to ensure that we stay the course on timeline." TechCrunch did in fact
18   advance payment for Fusion Garage.

19       26.   Later that month, Fusion Garage -- and, according to Mr. Rathakrishnan, its investors
20   and creditors -- agreed to the material terms of a merger in which CrunchPad would acquire
21   Defendant in exchange for 35% of the merged company's stock. A lengthy exchange on June 27,
22   2009 documented the agreement to the material terms. The sequence begins with Mr. Arrington
23   explaining that he was drafting a letter to inform prospective U.S. investors that an Asian investment
24   promised by Fusion Garage would not materialize. He asked, "One thing that just isn't clear is
25   where you stand [with respect to] our offer to acquire the company. I don't want to make
26   representations about your position that aren't accurate."

*Left margin:* 101 California Street
San Francisco, CA 94111-5802

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

1    27.    Mr. Rathakrishnan's initial response to Mr. Arrington's question was equivocal: "My

2    position has not changed. I want to make this work with you guys and have been keen on the

3    acquisition. Am prepared to do everything it takes to close the acquisition etc."

4    28.    Mr. Rathakrishnan's response, however, did not alleviate Mr. Arrington's concerns.

5    He therefore wrote back that "You don't seem to be able to speak authoritatively for you [investors]

6    and creditors. For reputation reasons I'm forced to notify our investors the deal is off. ... At this

7    point it looks like our position is to turn the project off completely."

8    29.    Mr. Rathakrishnan then replied with unequivocal confirmation that the merger

9    transaction would go forward on TechCrunch's terms. He stated that he "had some long chats with

10   some of my investors & creditors" and, "after having thought about this again for the whole of last

11   night and this morning," he was prepared to commit to the 35 percent deal TechCrunch had offered:

12   "**I will do this deal even if it means the only possibility is option 3**" (emphasis in original). He

13   then tried to wheedle a better deal, "humbly request[ing]" 40 percent instead of 35 percent. But "[t]o

14   be clear, I am not saying that I will only do this if the offer is increased by 5 %. I am saying that

15   while I would be thankful for that, I **will do the** deal even if it stays 35%. I hope the above answers

16   your question with no ambiguity" (emphasis in original). Exhibit B to this Complaint is a copy of

17   the email correspondence thread.

18   30.    Relying on Fusion Garage's representation that it accepted the 35 percent figure,

19   TechCrunch did not "turn the project off completely," as it had planned, but instead proceeded

20   forward with the parties' mutual development effort.

21   31.    During the summer of 2009, Defendant missed key milestones in the development

22   process, giving TechCrunch grave concern about Defendant's performance and intentions. During

23   August 2009, TechCrunch personnel traveled to Singapore and Taiwan to work with the Fusion

24   Garage personnel on the team, to meet potential investors and sponsors, and to meet with

25   representatives from Pegatron, a Taiwanese company that Fusion Garage lined up to manufacture the

26   CrunchPad. Mr. Rathakrishnan was absent from the Fusion Garage offices during part of that time.

27

28

101 California Street
San Francisco, CA 94111-5802

7
COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

In his absence, Fusion Garage personnel turned to TechCrunch personnel for leadership and guidance to solve both software and hardware challenges.

32. On August 31, frustrated with delays and communication problems with Defendant, and problems between Defendant and the company that was lined up to manufacture the CrunchPad's hardware, TechCrunch again threatened to shut down the collaboration. In response, Fusion Garage's Mr. Rathakrishnan pleaded: "Pls do not kill the project as yet. Pls hold off a week. ... I know how to deal with Pegatron and some of the challenges that we are currently facing. We can overcome these challenges." Mr. Rathakrishnan announced that he would bring a team of software and hardware engineers with him to the United States starting the following week to finalize the CrunchPad in anticipation of TechCrunch's major "CrunchUp" conference in San Francisco on November 20, 2009, which attracts many influential startups, investors, engineers, and marketers in technology industries.

33. Around September 8, 2009, Fusion Garage flew most of its personnel to California to integrate the teams and to work with TechCrunch personnel on the CrunchPad at the TechCrunch facility in Palo Alto, California for an extended period. Specifically, the TechCrunch and FusionGarage employees worked together on almost every component of the project. Particular objects of attention included screen visibility issues, touch screen performance issues, user interface issues, issues relating to "gestures" used for commands, and keyboard page design issues, to name only a few.

34. On November 13, 2009, Mr. Rathakrishnan emailed TechCrunch stating "as per my last email, we are [on] course for getting a lockdown device . . . by late Monday [November 16] [and we] will arrange to come over once i have it locked down on monday." Mr. Rathakrishnan also agreed that "yes, we shld [sic] target the event in sf," meaning the November 20, 2009 TechCrunch "CrunchUp" event. Exhibit C to the Complaint is a copy of that communication.

## TechCrunch's Contributions to the Joint Project

35. TechCrunch made numerous contributions to the joint project in collaboration with Defendant during the period of the collaboration. Indeed, the overall conception, blueprint,

8

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY, MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

1  guidance, and senior level support for the project emanated substantially from TechCrunch. But

2  even apart from that high-level direction on virtually a daily basis, TechCrunch's detailed

3  contributions included the following:

- design and oversight of the specifications, performance characteristics (including boot speed that Defendant prominently features in the advertising and promotion of its JooJoo product), software architecture, hardware platform design and component sourcing, hardware form factor and other designs, driver integration, application programming interface, user interface, and documentation;

- creation of the first two prototypes of the CrunchPad;

- payment of vendors and of debts incurred by Fusion Garage;

- advice and direction on solving technical problems and hardware and software bugs;

- the hosting of Fusion Garage personnel at TechCrunch's headquarters in California to promote the collaboration, the sponsorship of United States visas for Fusion Garage personnel, and the securing of temporary residences for the personnel in connection with that collaboration; and

- the lining up of promotion, marketing, and distribution channels for the CrunchPad.

36.    TechCrunch shared its expertise, ideas, advice, resources, and connections with

Defendant privately for Defendant's shared benefit in the joint project.

### Defendant's Abrogation of the Joint Project and Its Misappropriations

37.    On November 10, 2009, Fusion Garage registered the domain name thejoojoo.com

without informing TechCrunch. TechCrunch did not discover that Fusion Garage had registered this

domain name until December 7, 2009.

38.    On November 17, 2009, three days before the scheduled product launch, Mr.

Rathakrishnan emailed Mr. Arrington to tell him that the "updated hardware is still on its way" and

that "[F]riday will be a challenge now . . . but the bigger issue is the required investment." Mr.

Rathakrishnan mentioned that he "had a conf call with Bruce last night. (An existing shareholder

who is looking to co-invest and is a friend of the 2 new investors who were to be part of the new

round)" and forwarded an email from Bruce Lee to Mr. Rathakrishnan which portrays Fusion

101 California Street
San Francisco, CA 94111-5802

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

1  Garage as the sole developer of the CrunchPad, and TechCrunch as a team of marketers with no
2  "formal commitment to the development of this device."

3  39.  On November 18, 2009, Mr. Arrington emailed Mr. Rathakrishnan stating that "[i]t's
4  clear your investors do not understand that we created this product jointly, and there is no way for
5  either of us to bring it to market without the other party."

6  40.  That same day, Mr. Rathakrishnan replied to Mr. Arrington and said that "I
7  understand this came out of the blue but I needed to say where things were as soon as it was made
8  known to me."  Mr. Rathakrishnan also wrote that he was meeting with those same investors shortly
9  and would call Mr. Arrington "later today to discuss this."

10  41.  On November 29, 2009, Mr. Rathakrishnan emailed Mr. Arrington to say that "[t]he
11  shareholders are not willing to move from their position" and stating, confusingly, that "there isn't
12  an alternative offer on the table from Crunchpad."

13  42.  That same day, Mr. Arrington replied to Mr. Rathakrishnan and clarified that "[w]e
14  have not come back to you with any counter offer to the email you forwarded because you and your
15  shareholders have communicated to us that moving forward without us is something that you
16  consider to be a legitimate and legal option.  In other words, your 'counter' offer is theft of
17  intellectual property."

18  43.  That was the last email correspondence between the parties.  Exhibit D to this
19  Complaint is a copy of the email thread containing these messages.

20  44.  On December 7, 2009, Mr. Rathakrishnan held a press conference in San Francisco
21  where Fusion Garage announced the release of the JooJoo

22  **Defendant's Lies and Misleading Statements Before and During the Project**

23  45.  From the very start of their joint venture, Fusion Garage engaged in serial
24  misrepresentations to TechCrunch and other business partners working with TechCrunch on the
25  CrunchPad project. These misrepresentations were intended to and did induce TechCrunch to enter
26  into a joint venture with Fusion Garage; and then induced TechCrunch to stay in the joint venture

27

28

10
COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

1  even while Fusion Garage implemented its plan to steal the CrunchPad from under TechCrunch's
2  nose.

3      46.     To begin, Fusion Garage represented to TechCrunch that it would collaborate with
4  Tech Crunch in a joint effort to develop and bring the CrunchPad to market. Starting as early as
5  January 2009, Fusion Garage represented to TechCrunch that it was devoting substantially all of its
6  resources to the CrunchPad project. Upon a visit to Singapore in August 2009, TechCrunch learned
7  that Defendant did not start significant development efforts until many months later.

8      47.     When Defendant first met TechCrunch in September 2008, it claimed to have
9  developed a browser-based operating system, just like the one TechCrunch was seeking for its
10  CrunchPad project. In fact, it had developed no such thing, and the demo product it showed to
11  TechCrunch was little more than an off-the-shelf browser and some HTML--something TechCrunch
12  did not realize until nearly a year later, by which time the project was well underway.

13      48.     Moreover, Defendant had not even been *working* on a browser-based operating
14  system. Instead, during the entire time Defendant was allegedly in "stealth mode" as a browser-
15  based operating system start-up, the same people--including CEO Mr. Rathakrishnan--were working
16  on a desktop-based system called Velvet Penguin. Velvet Penguin's demise and Defendant's
17  emergence coincided almost exactly, and Defendant misrepresented the nature of its prior
18  development efforts when it sought to become TechCrunch's partner on the CrunchPad project.

19      49.     TechCrunch was approached by multiple software and hardware developers with
20  offers to assist it in developing the CrunchPad. Based on Defendant's misrepresentations,
21  TechCrunch selected Defendant over these other prospective partners, and thus relied upon
22  Defendant's misrepresentations to its detriment.

23      50.     Defendant promised TechCrunch that it would agree to a merger with CrunchPad Inc.
24  under which Defendant's owners and investors would receive no more than 35 percent of the stock
25  in the merged entity. It represented further that its investors and creditors had agreed to this
26  arrangement. TechCrunch indicated on June 27, 2009, that it would discontinue the CrunchPad
27  project if Defendant and its investors and creditors did not agree to these terms.

28

11

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

51.     In August, when TechCrunch executives visited the Taiwan headquarters of Pegatron, the company preparing to manufacture the CrunchPad, TechCrunch learned that Defendant had been falsely representing to TechCrunch the costs of the product's components as $20-$30 per unit higher than the actual costs indicated by Pegatron.

52.     Beginning at a point unknown to Plaintiff, Defendant misrepresented its intention to continue working on the joint project in collaboration with TechCrunch. Defendant made the misrepresentations while secretly making its own plans to divert the joint project to its own exclusive purposes and to exclude TechCrunch from the project.

53.     During the fall of 2009, Pegatron terminated its relationship with Defendant because of Defendant's failure to pay its debts. This was a blow to the hardware development and manufacturing plans of the joint project. Nevertheless, after that date, Defendant both represented that the project was moving forward satisfactorily and concealed the loss of the most critical supplier to the project

54.     In November, even as Defendant conspired to release its "JooJoo" product line, it continued to lead TechCrunch on. On November 10, Mr. Rathakrishnan informed Mr. Arrington that replacement panels "will now be ready by Friday. (cleared all hurdles there, so no further delay is anticipated) [I] will be able to show off a final product demo either on the 16th or 17th of nov. this is the version that is ready to go live on stage." That same day, Defendant registered thejoojoo.com.

55.     TechCrunch had no inkling of Defendant's plans. On November 13--three days *after* registering the JooJoo domain name--Mr. Rathakrishnan again assured TechCrunch that "we shld target the [November 20] event in sf."

56.     As noted, Defendant destroyed the joint venture only three days before the scheduled November 20 launch. It conceded on November 18 that its actions were "out of the blue."

57.     Each of these representations was material and critical to TechCrunch's decision to commence and then continue a partnership with Defendant on the CrunchPad project. At the time Defendant made these representations, they were false and Defendant knew they were false--or, at a

101 California Street
San Francisco, CA 94111-5802

12
COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

1  minimum, Defendant made these statements recklessly and without regard for the truth, or

2  Defendant had no reasonable grounds for believing them to be true.

3      58.    These promises were important to the joint effort between Defendant and

4  TechCrunch. At the time Defendant made these promises, Defendant did not intend to perform

5  them. Defendant intended that TechCrunch rely on Defendant's representations and promises, or

6  intended to deceive TechCrunch, so that Defendant would benefit from TechCrunch's continued

7  investment in and efforts and collaboration on the CrunchPad project.

8      59.    TechCrunch reasonably relied on Defendant's representations, promises and

9  deceptions in continuing its collaboration and its contribution of money, effort, and services to help

10  develop and market the CrunchPad.

11                    **Defendant's False Statements in Promoting Its Own Tablet**

12      60.    On December 7, 2009, Defendant conducted a videoconference to unveil and promote

13  its JooJoo tablet. During the videoconference, Defendant made numerous representations about the

14  JooJoo tablet, about the relationship between TechCrunch and the tablet, and about TechCrunch.

15  During the videoconference, Defendant advertised that it would begin taking pre-orders online for

16  the product on December 11, 2009.

17      61.    During that videoconference, Defendant made numerous false or misleading

18  representations. Among them are the following:

19      • "We had many discussions about a future potential deal whereby TechCrunch would
        acquire our company, but nothing tangible ever came out of that."
20

21      • "We took the following actions under the Fusion Garage umbrella. We completed
        development of our operating system. We hired in the necessary expertise to make
        key hardware design decisions and developed the hardware platform on our own. We
22        solved the remaining technical issues and developed a new and more finished
        prototype."
23

24      • "Many conversations did take place about a possible acquisition of Fusion Garage by
        TC and TC even set up a company called CrunchPad, Inc. which would have been the
        vehicle for the acquisition but nothing ever came out of the discussions as we were
25        never able to reach an agreement for a mutually acceptable business deal."

26      • "There was never any agreement of any kind between the two companies. This was
        nothing more than a potential acquisition that didn't occur as the parties would never
27        come to terms."

28
                                        13
              COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
        MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

1

2
- "If anyone was led on here, it was us as Michael was never willing to come to terms and instead stepped back while we took all the risk, did all the work needed to move forward and bring the product to market."

3

4
- "Fusion Garage made all the hardware design decisions for the final prototype and getting a successful contractual relationship with an ODM."

5
- "It was the Fusion Garage shareholders who have provided the necessary funds."

6

7
- "Even after taking all of the risk and undertaking all of the physical and intellectual business actions required to take the product to market, we provided Michael with suggested terms for a possible business deal."

8
- "Nothing has been signed, nothing was ever on the table."

9

10

11
- "Michael made many promises, many assurances suggesting that he would deliver on the hardware, deliver on the software, deliver on the funding, none of which came through. And we had been working with him for the last one year trying to strike a deal but nothing came out of [inaudible]. Despite those assurances, nothing happened."

12
- "Michael did not deliver on his promises."

13

14
62.     In the context of the videoconference promoting its new JooJoo tablet, the references

15
to "Michael" were to Michael Arrington and TechCrunch in light of Mr. Arrington's roles in

TechCrunch.

16

17
63.     Defendant has additionally advertised and promoted its product by selective

presentations and demonstrations to various media outlets for broad public dissemination that

18
include similar or other false representations.

19

20
## FIRST CAUSE OF ACTION:  FALSE ADVERTISING

## IN VIOLATION OF THE LANHAM ACT

21
64.     TechCrunch incorporates by reference and realleges paragraphs 1 through __ above.

22

23
65.     TechCrunch and Defendant, although once collaborators in a joint project aimed at

developing and commercializing the CrunchPad, are now competitors in developing and

24
commercializing their own separate products.

25
66.     Defendant has used false and misleading descriptions and representations of facts in

26
its commercial advertising and promotion of the JooJoo product that intentionally and materially

27

28
14
COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY, MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

1   misrepresented the nature, characteristics, and qualities of the goods and commercial activities of
2   both Defendant and TechCrunch, and it continues to do so.

3   67.    Defendant's conduct has damaged, and will unless enjoined, continue to damage
4   TechCrunch. As a consequence of Defendant's misconduct, TechCrunch is entitled to relief as set
5   forth below.

6   ## SECOND CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY

7   68.    TechCrunch incorporates by reference and realleges paragraphs 1 through __ above.

8   69.    Defendant and TechCrunch had a common interest in fulfilling Michael Arrington's
9   dream of making a "dead simple and dirt cheap touch screen web tablet to surf the web" that would
10  appeal to consumers.

11  70.    Defendant and TechCrunch also had a common interest in developing the web tablet
12  device and in bringing the device to market.

13  71.    To achieve these common interests, Defendant and TechCrunch personnel
14  collaborated to develop the CrunchPad's hardware, software, and industrial components and to
15  identify and secure sufficient investment funds and other capital to keep the venture afloat. This
16  Complaint states some of TechCrunch's contributions above.

17  72.    Defendant and TechCrunch jointly managed and controlled their undertaking to
18  develop and market the CrunchPad, with representatives from both companies participating in
19  making important decisions about the technological direction, schedule, pace, and strategy of their
20  development effort and the intended product launch.

21  73.    TechCrunch and Defendant associated with each other to carry on as co-owners of a
22  business to commercialize and sell the CrunchPad product.

23  74.    Under California law, the association of two or more persons to carry on as co-
24  owners of a business for profit forms a partnership, whether or not the persons intend to form a
25  partnership. Also under California law, property acquired by a partnership is property of the
26  partnership and not of the partners individually.

27

28  COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

75. Defendant and TechCrunch mutually agreed and acknowledged that they would each make capital investments of money, time, and services to achieve their common interests.

76. Defendant and TechCrunch also agreed and expected that they would both benefit from the profits in selling the CrunchPad to consumers.

77. As it became evident that Defendant had substantial financial difficulties, and was relying on loans at exorbitant rates from unorthodox loan sources, TechCrunch and Defendant discussed a merger between Defendant and CrunchPad and had extensive discussion of the terms. They agreed that Defendant would own 35 percent of the merged company which would profit from the commercialization and sales of the CrunchPad pursuant to their collaboration. Mr. Rathakrishnan confirmed his absolute agreement on that point while expressing his wish that Defendant could have obtained a better deal.

78. As a joint venturer, Defendant had a fiduciary duty to deal with TechCrunch at all times with the highest loyalty and the utmost good faith, to deal with TechCrunch as a reasonably prudent business partner, to refrain from taking unfair advantage or making any secret profit from the joint venture, to refrain from using or disclosing ideas TechCrunch disclosed in confidence, and to refrain from usurping any opportunity of the joint effort or otherwise compete with the venture even after dissolution.

79. Defendant breached its fiduciary duties to TechCrunch by various acts including, but not limited to: (1) concealing important facts about its relationships with other business partners, including Pegatron, who were important to the success of the joint effort; (2) misrepresenting its intention to jointly launch the CrunchPad in November 2009 while it was secretly planning on launching the same exact product without TechCrunch under another name; (3) pulling out of the joint effort just days before the scheduled product launch; (4) simultaneously claiming exclusive intellectual property rights in the CrunchPad, despite the fact that much of the intellectual property in the product belongs to other companies and that TechCrunch originally conceived the device, developed a working prototype before meeting Mr. Rathakrishnan of Defendant, and substantially contributed to the development and marketing of the CrunchPad during their joint effort; (5)

16

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY, MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

1  misrepresenting communications between the companies to the public; and (6) bringing the product

2  to market under a different name (the "JooJoo") and offering to sell the product to consumers

3  without TechCrunch.

4      80.      TechCrunch did not provide informed consent for Defendant to act in this manner.

5      81.      Substantially because of Defendant's conduct, TechCrunch has suffered injury in the

6  form of economic loss and loss to its business reputation including but not limited to: (1) loss of

7  TechCrunch's substantial investment of money and services for the CrunchPad's development and

8  marketing; (2) loss of future profits in expected sales of the CrunchPad; and (3) significant injury to

9  TechCrunch's business reputation among consumers and potential investors.  Defendant breached its

10  fiduciary duty  with fraud, malice, and oppression directed at TechCrunch.  TechCrunch is therefore

11  entitled to relief as set forth below.

12  **THIRD CAUSE OF ACTION: MISAPPROPRIATION OF BUSINESS IDEAS**

13      82.      TechCrunch incorporates by reference and realleges paragraphs 1 through __ above.

14      83.      TechCrunch made a substantial investment of time, effort and money in creating the

15  CrunchPad, promoting it, developing it, refining its performance and characteristics, and preparing it

16  for the market.

17      84.      TechCrunch, not Defendant, came up with the original concept of the CrunchPad as a

18  "dead simple and dirt cheap touch screen web tablet to surf the web," which uses an iPhone-like

19  touch screen keyboard to input data and which loads directly to the web browser and uses a browser,

20  in effect, as an operating system.

21      85.      At the time that TechCrunch originated the concept and promoted it, Defendant had

22  not formed any business plans to produce a product like the CrunchPad.

23      86.      At the time that TechCrunch brought Defendant into the project, Defendant had not

24  formed any business plans to produce a product like the CrunchPad.

25      87.      TechCrunch furnished to the joint project many of the CrunchPad/JooJoo's design

26  characteristics.  The entire concept of the product derived from Michael Arrington at Techcrunch,

27  including the use of a large-screen touch-screen device; the function of booting extremely rapidly

28

17

COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

1 and straight to a browser, the lack of a desktop, no hard drive other than for the software footprint,
2 and other aspects. Among the other detailed design ideas that TechCrunch contributed to this joint
3 project *which were evident in the limited public display to date of the JooJoo product* are: (1) the use
4 of a white instead of a black background to better display web pages; (2) the use of large icons on
5 the home screen so that users can quickly navigate to their favorite web pages; (3) the use of
6 proxying video directly to the device so that video can be played without the use of a flash player;
7 (4) the application programming interface, or API, with the browser for custom applications; (5) the
8 idea and know how for empowering the device to play video output to a resolution of 1080p, also
9 known as full high definition. TechCrunch believes, and therefore alleges, that Defendant's ersatz
10 JooJoo product incorporates other, less visible, ideas that TechCrunch furnished to Defendant in the
11 course of their joint project.

12 88. Despite TechCrunch's contribution, Defendant has claimed exclusive rights in the
13 CrunchPad device, and has begun marketing the same device under a different name, the JooJoo,
14 without TechCrunch.

15 89. In doing so, Defendant has misappropriated TechCrunch's property rights in both the
16 ultimate product of their joint collaboration, i.e. the CrunchPad/JooJoo;, in the specific ideas about
17 the look and design of the CrunchPad/JooJoo that TechCrunch contributed in their partnership with
18 Defendant; and in the business that the parties created to commercialize the product.

19 90. Defendant has appropriated to itself the exclusive benefit of TechCrunch's
20 contributions to the project.

21 91. Through its misappropriation Defendant has injured TechCrunch by depriving
22 TechCrunch of a first-mover advantage and of a speed-to-market advantage with a groundbreaking
23 new product that TechCrunch conceived, pioneered, developed, and improved. Defendant has
24 caused TechCrunch harm in its business or property and has deprived it of rightful profits from its
25 endeavors. Defendant's misappropriation was with fraud, malice, and oppression directed at
26 TechCrunch. As a consequence, TechCrunch is entitled to relief as set forth below.

27 **FOURTH CAUSE OF ACTION: FRAUD AND DECEIT**

28

101 California Street
San Francisco, CA 94111-5802

92. TechCrunch incorporates by reference and realleges paragraphs 1 through __ above.

93. Defendant made numerous false representations, negligent representations, and promises to TechCrunch throughout their collaboration, including examples identified above.

94. At the time Defendant made these representations, they were false, or Defendant made them recklessly and without regard for the truth, or Defendant had no reasonable grounds for believing them to be true.

95. At the time Defendant made its promises, Defendant did not intend to perform them.

96. These representations and promises were material to the joint effort between Defendant and TechCrunch.

97. Furthermore, Defendant and TechCrunch were business partners and were collaborating in a joint venture to develop and market the CrunchPad.

98. Despite Defendant's fiduciary obligations to TechCrunch, Defendant failed to disclose to TechCrunch that Pegatron had terminated its relationship with Defendant.

99. Defendant intended that TechCrunch rely on Defendant's representations and promises, or intended to deceive TechCrunch, so that Defendant would benefit from TechCrunch's continued investment in and efforts and collaboration on the CrunchPad project.

100. TechCrunch reasonably relied on Defendant's representations, promises and deceptions and contributed its money, effort, and services to help develop and market the CrunchPad.

101. Substantially as a result of Defendant's conduct, TechCrunch has suffered damage in its business or property. Defendant acted with fraud, malice, and oppression directed at TechCrunch. As a consequence, TechCrunch is entitled to relief as set forth below.

## FIFTH CAUSE OF ACTION: UNLAWFUL BUSINESS PRACTICES AND FALSE ADVERTISING UNDER CALIFORNIA LAW

102. TechCrunch incorporates by reference and realleges paragraphs 1 through __ above.

19
COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY, MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

101 California Street
San Francisco, CA 94111-5802

1    103.    Defendant, through the conduct and violations described above, has engaged in

2  unlawful business practices and false advertising against Plaintiffs in violation of California

3  Business and Professions Code sections 17200 and 17500 and under the common law.

4    104.    Unless enjoined, Defendant will continue to engage in the unlawful business practices

5  and false advertising.

6    105.    In connection with Defendant's unlawful business practices and false advertising,

7  Defendant has deprived TechCrunch of money and property. Defendant has also gained money and

8  property that rightly belongs to TechCrunch to which TechCrunch is entitled.

9    106.    As a consequence of Defendant's violations, Plaintiffs are entitled to relief as set forth

10  below.

11                                **PRAYER FOR RELIEF**

12    WHEREFORE, Plaintiffs pray that the Court enter judgment as follows:

13    A.    Preliminarily and permanently imposing a constructive trust upon revenues obtained

14  by Defendant in connection with its breaches, violations, and unlawful behavior, specifically

15  including all revenues generated by sales of the JooJoo product;

16    B.    Awarding to Plaintiffs their actual damages from Defendant's misconduct;

17    C.    Awarding to Plaintiffs exemplary damages in the enlightened conscience of the jury;

18    D.    Awarding to Plaintiffs the Defendant's profits arising from its unlawful conduct;

19    E.    Awarding to Plaintiffs restitution of Defendant's unjust enrichment and unlawful

20  gains;

21    F.    Preliminarily and permanently enjoining Defendant:

22        • from distributing or commercializing the JooJoo product;

23        • from false, misleading, deceptive or confusing advertising or representations relating

24        to Defendant or its products, services, or commercial activities or relating to Plaintiffs

25        or their products, services, or commercial activities;

26        • from otherwise unfairly competing with Plaintiffs and unlawfully injuring their

27        reputation and goodwill; and

101 California Street
San Francisco, CA 94111-5802

28
                                20
COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

1          • to deliver up for destruction all materials in its possession, including electronic

2              resources, that constitute or are adapted to false advertising, or other means of making

3              them that are in its possession or under its control;

4      G.      Awarding Plaintiffs attorney's fees and costs of suit; and

5      H.      Granting such other relief as the Court may determine just and equitable.

6                              **DEMAND FOR JURY TRIAL**

7      Plaintiffs hereby demand trial by jury.

8

9                                      Respectfully submitted,

10     Dated: December 10, 2009              WINSTON & STRAWN LLP

11

12                                   By: *Andrew P. Bridges*

13                                       ANDREW P. BRIDGES
                                         DAVID S. BLOCH

14                                       NICHOLAS SHORT
                                         Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          21
                 COMPLAINT FOR VIOLATION OF THE LANHAM ACT, BREACH OF FIDUCIARY DUTY,
                 MISAPPROPRIATION OF BUSINESS IDEAS, FRAUD AND DECEIT, AND UNFAIR COMPETITION

Exhibit A

This is Google's cache of http://www.fusiongarage.com/blog/. It is a snapshot of the page as it appeared on Nov 28, 2009 19:21:31 GMT. The current page could have changed in the meantime. Learn more

These terms only appear in links pointing to this page: **http www fusiongarage com blog**                    Text-only version

# FusionGarage

The official blog

- Home
- About Fusiongarage
- 

Switcher

## Fusiongarage is 1 yr old!

February 4th, 2009
6 comments

Today is officially Fusiongarage's 1st birthday!



The last year was pretty eventful. Though we started discussing about the team and company sometime in early January 2008, finding a name for the startup (with a url that was available!), getting a convenient office space, bringing together the

initial team etc took us a bit of time. February 2008, we were just setting up fusiongarage's office space. By day, we were assembling furniture we bought from IKEA and by afternoon we were busy brainstorming our product idea. Once we settled on the core product idea, we set out to build a prototype application. We ended up building some really cool stuff in the next few months.

When we eventually had a demo-able version of our idea (it had a 'grander' vision of what we are building right now), it was also that time of the year, when TechCrunch had started accepting applications for the TechCrunch50 2008 conference.

We decided to send our entry and a few weeks later, we found ourselves at the demopit in the conference venue. We didn't really launch our product/startup there, the plan was to showcase the concept to the attendees, gauge their interest and gather feedback. People seemed to like our idea, and some interesting meetings were scheduled for the next few days.



The week following TC50, we also attended Mobilize '08 - a conference targeting the mobile web space, organized by GigaOm network. People liked our product idea there as well; we even won the audience choice award! There were a few very interesting observations made here as well.

So after a fruitful 3 weeks at SFO, we were back to Singapore, only to start preparing our software for the Intel Developer Forum, at Taipei, Taiwan. What better place to present our software to Intel based hardware manufacturers, than the IDF! So off, we went. ( More of that later, as things get 'declassified' [x] :P )

The collaboration with the Crunchpad project happened as a result of meetings we had with Mike Arrington and co, subsequent to TC50. We worked closely with Louis Monier in getting the software in shape for the hardware prototype B. We continue to work with them in getting the software in shape to make crunchpad a easy to use device. This is where we stand as of prototype-B: (Details over at TechCrunch's update )

FusionGarage



As I said, the last year had been a very exciting year for FusionGarage. We expect that 2009 is gonna be no less exciting!

Arul Prasad General

# Techcrunch Tablet Prototype B

January 19th, 2009
32 comments

There is an air of excitement permeating through Fusion Garage at the moment. Michael Arrington of Techcrunch just wrote an update on the Techcrunch Tablet Prototype B.

It's our software that is running on the tablet as demonstrated in the videos embedded in the article. We continue to work with Louis Monier on the feature set and the user experience. We are thrilled with this progress and would like to take the opportunity to thank Michael and Louis for giving us the opportunity to work with them on the Techcrunch Tablet.

Its early days yet but we are big believers of the Browser As An Operating System and the Techcrunch Tablet Initiative.

http://74.125.155.132/search?q=cache:P_-Nbt67tloJ:www.fusiongarage.com/blog/+http://www.fusiongarage.com/blog&cd=1&...    12/4/2009

Case3:09-cv-05812-JCS   Document1   Filed12/10/09   Page26 of 40

A nice way to begin 2009 here at FusionGarage !

chandra General, TechCrunch Tablet browser, operating system, techcruch tablet

# Garage Is Open !

January 19th, 2009
4 comments

Hey there,

We are finally out in the open after spending almost a year in stealth !

It all started with the following lead :

"What if the browser could boot without an OS ? How different would the world be ? "

We spent 2008 working on the above lead and are excited

with the progress we have made.

More details to follow in subsequent posts.

Garage Is Open!

chandra General Garage, General

RSS feed

- Google
- Youdao
- Xian Guo
- Zhua Xia
- My Yahoo!
- newsgator
- Bloglines

- iNezha

## Random Posts

- Techcrunch Tablet Prototype B
- Fusiongarage is 1 yr old!
- Garage Is Open !

## Tag Cloud

browser Garage General operating system techcrunch tablet

## Categories

- General
- TechCrunch Tablet

## Archives

- February 2009
- January 2009

## Meta

- Log in

Top WordPress
Copyright © 2008-2009 FusionGarage
Theme by mg12. Valid XHTML 1.1 and CSS 3.

Exhibit B

**From:** Chandrasekar Rathakrishnan [mailto:chandra@fusiongarage.com]
**Sent:** Saturday, June 27, 2009 3:01 PM
**To:** Michael Arrington
**Cc:** Heather Harde
**Subject:** Re: moving forward

Mike,

This mail might appear a bit long but pls stay with me as I outline my thoughts leading to
my decision. (yes, i answer your question at the end)

I had some long chats with some of my investors & creditors.

The crux is you need to acquire a "clean" company (FusionGarage) to make this deal
work at your end.

Accordingly, the offer is 35 % of CrunchPad for FusionGarage (inclusive of all equity,
stock options and loans flushed) .

The tricky bit of the deal has been the issue of flushing loans as part of the above offer.

The total loans outstanding is about USD 500k. At my end , i only see 3 ways of making
this work.

1) All loans remain outstanding until the next round of funding and gets converted then
at a small discount to the price of that round
or gets repaid at that point as part of the raising.

I can make the above option work and I prefer this option for obvious reasons but I
understand its off the table. so, that's that.

2) All loans convert as part of this round of raising.

Understand, this is not a preferred option as it results in greater dilution for all involved.
It will be another 16 % dilution , assuming
a valuation of 3 million. So, this option is out as well.

3) All loans convert prior to acquisition and CrunchPad acquires a "clean" company for
35 %.

Understand that this is the only option if the other 2 options are off the table. The only
way I see this working is that I assign my
equity portion of CrunchPad arising from my direct equity in FusionGarage to investors
and creditors. That would mean that I assign
the total of 20 % to investors and creditors. So, that leaves me with just the stock
options grant which is proposed at 11 %.

With all that said and as mentioned previously, even while going with option 3, I would need to return about USD 75 K out of the outstanding loans. The rest can be converted as per option 3.

So, after having thought about this again for the whole of last night and this morning, **I will do this deal even if it means the only possibility is option 3.**

Having said that, I would like to humbly request that you consider increasing the offer to acquire FusionGarage. It will be great if you would consider increasing the offer of 35 % to 40 % instead. This would give me that bit more to play with.

To be clear, I am not saying that I will only do this if the offer is increased by 5 %.

I am saying that while I would be thankful for that, I **will do the** deal even if it stays 35%.

I hope the above answers your question with no ambiguity.

Thanks,
Chandra

On Sat, Jun 27, 2009 at 2:17 PM, Michael Arrington <editor@techcrunch.com> wrote:
Chandra,

You don't seem to be able to speak authoritatively for your imvesdors and creditors. For reputation reasons I'm forced to notify our investors the deal is off.

Let's talk Monday and see where we stand. At this point it looks like our position is to turn the project off completely.

Copying keith so that he can gracefully wind down discussions he is leading.

Mike

On Jun 26, 2009, at 9:58 PM, Chandrasekar Rathakrishnan <chandra@fusiongarage.com> wrote:
Mike,

Thanks for writing an email to investors. Understand why its not easy and am thankful that you are trying.

My position has not changed. I want to make this work with you guys and have been keen on the acquisition.

Am prepared to do everything it takes to close the acquisition etc.

Pls let me know how it goes with the investors.

Thanks,
Chandra
On Sat, Jun 27, 2009 at 12:37 PM, Michael Arrington <editor@techcrunch.com> wrote:
Chandra,

I'm putting together a long email to investors this evening outlining where we stand and why they should consider an investment without the asian money. It isn't going to be easy, but I'll try.

One thing that just isn't clear is where you stand wrt our offer to acquire the company. I don't want to make representations about your position that aren't accurate. Please let me know.

Mike

Exhibit C

**From:** Chandrasekar Rathakrishnan [mailto:chandra@fusiongarage.com]
**Sent:** Friday, November 13, 2009 6:01 PM
**To:** Michael Arrington
**Cc:** brian@techcrunch.com; Heather Harde
**Subject:** Re: my schedule

mike,

thanks for updating. as per my last mail , we are course for getting a lockdown device
(with new panel and updated software and abt 5 of them) by late Monday.

will arrange to come over once i have it locked down on monday. yes, we shld target the
event in sf.

additionally, i will be in dialogue with the potential investors over the weekend and will
revert affirmatively on status of that late weekend.

thanks,

chandra

On Fri, Nov 13, 2009 at 2:00 PM, Michael Arrington <editor@techcrunch.com> wrote:
I'm leaving next saturday morning (before thanksgiving) for washington. I'll be back in
January. If we're doing something, it will have to be next week. We happen to be having
a crunchup event next week in san francisco. that is the day.

Exhibit D

-----Original Message-----
From: Michael Arrington [mailto:editor@techcrunch.com]
Sent: Sunday, November 29, 2009 6:59 AM
To: Chandrasekar Rathakrishnan; Heather Harde
Cc: Lior Zorea
Subject: Re: Update

Chandra,

We have not come back to you with any counter offer to the email you
forwarded because you and your shareholders have communicated to us
that moving forward without us is something that you consider to be a
legitimate and legal option. In other words, your "counter" offer is
theft of intellectual property.

I am flying back to the bay area today, and I will write a post this
evening telling our readers the status of the project. This week we
will file lawsuits to stop you from taking our property, just as you
would do if we took the software and hardware specs and tried to move
forward without you.

This is a crucial moment for you. One that you will have to look back
on the rest of your life. This can turn into a circus and the project
can die, or you can do the right thing for your business and your soul
and engage with me in a legitimate, legal and ethical way.

Fairness is one thing. Theft is another. What kind of person are you?
I'd like to know.

My post will go up this evening. I will try to call you this
afternoon. But the post goes up whether we talk or not.

I am so sad and disappointed that you even consider this an option. We
could have done great things together.

Mike


On Nov 29, 2009, at 2:46 AM, Chandrasekar Rathakrishnan wrote:

Mike,
Following our phone discussion, I had another round of discussions
with my shareholders.

The shareholders are not willing to move from their position as they believe their stand is justified.

On the other hand, there isn't an alternative offer on the table from Crunchpad.

We have a sizable funding offer on the table that will take us to market.

I have to do right by the shareholders and employees and make the decision that is in the best interest of all stakeholders.

Regrettably, given that both parties are unable to reach a favorable agreement, I have no choice but to move forward.
Chandra


\*\*\*

**From:** Chandrasekar Rathakrishnan <chandra@fusiongarage.com>
**Date:** November 18, 2009 4:36:49 AM PST
**To:** Michael Arrington <editor@techcrunch.com>
**Cc:** heather harde <heather@techcrunch.com>
**Subject: Re: no good news**

Mike,

I understand this came out of the blue but I needed to say where things were as soon as it was made known to me.

Its not good and in the spirit of transparency I forwarded the confidential note.

From investor's perspective he is proposing what he deems as fair and I can't fault him for that.

I do not think the tone of the email was intended the way it might have come across.

Meeting them shortly.

Will call you later today to discuss this.

Thanks,
Chandra

On Wed, Nov 18, 2009 at 7:59 AM, Michael Arrington <editor@techcrunch.com> wrote:
Chandra,

We can discuss when you return.

It's clear that your investors do not understand that we created this product jointly, and there is no way for either of us to bring it to market without the other party. We'd obviously take legal action against you and any manufacturer of the device if you were to move forward without us in violation of our rights. And regardless, there is no path to success in my opinion even if we were to allow you to do so.

What's most disconcerting to me is the tone of the email. I'd never do business with this person, and I'd never allow him to own any part of any project I work on.

Mike

On Nov 17, 2009, at 3:50 PM, Heather Harde wrote:

Chandra,
As you know, I normally defer primary communications on CrunchPad to Michael, since he is founder and CEO of the business. However, Bruce Lee's letter below is so uninformed, inaccurate and insulting that I'm at a total loss for your business purpose in sharing it. Your cover note equally damaging. Strategically, operationally, financially completely wrong. Irreparable for me.
Heather

From: Chandrasekar Rathakrishnan [mailto:chandra@fusiongarage.com]
Sent: Tuesday, November 17, 2009 2:50 PM
To: Michael Arrington
Cc: Heather Harde
Subject: no good news

Mike,

no good news to update. updated hardware is still on its way , so that's a timing issue. friday will be a challenge now.
got delayed at taiwan's end. but the bigger issue is the required investment.

I had a conf call with Bruce last night. (An existing shareholder who is looking to co-invest and is a friend of the 2 new investors who were to be part of the new round).

and it was not a good call. Pls see his email note to me (below) for the details. I am in predicament and it's unenviable.

We need the investment but they are not willing to proceed on the current structure as

proposed by CrunchPad.

I have spent the night deliberating on this and I cannot substantiate my arguments against the issues raised.

I know the counter proposal from Bruce is going to upset you greatly but I have no choice but to put it forth.

They are pretty resolute and it's extremely hard for me to ignore my fiduciary responsibility.

Unless there is an alternative funding available at the right terms , it's hard for me to turn this down.

Given its importance, I am heading to Miami to meet with them to discuss the situation further but doubt their position will change significantly.

I am going to get on my connection flight to Miami in the next few minutes and I will be in the air for the next couple of hours or so and out of circulation during that time.
Given the urgency of the matter, pls let me have your thoughts.

Thanks,
Chandra

---------- Forwarded message ----------
From: <drlee@pacific.net.sg>
Date: Tue, Nov 17, 2009 at 11:51 PM
Subject: Rejection of Arrington's "offer"
To: chandra@fusiongarage.com

Hello Chandra,

Thanks for taking the time to discuss things. I just wanted to drop a note to recap our conversation.

As I mentioned to you, the shareholders have expressed concern that there is no formal offer letter from TechCrunch. They are also not happy with the verbal offers that you have relayed. We had been prepared to consider an offer of 12% last December based on your comments about the value that Michael Arrington and his team would add – coupled with the fact that we were still early in the development of the device and your recommendations that a merger would be the best way to move forward.

However, since that time, we as your shareholders (and you/your development team) have assumed all related operational and developmental costs of the device. We have

told you at several points that based on our significant investments, we would be willing to entertain an offer of 50%, if not significantly more. You have argued an offer of 25% on their behalf until you were blue in the face – suggesting that Michael Arrington/TechCrunch would bring connections, funding and marketing valuable in bringing the device to market faster.

We appreciate that Arrington and his team have generated marketing/awareness via their blog posts and relationships in the technology community over the last year. However, we feel strongly that this awareness is of minor value without a product to back it up – a product funded completely by your investors and shareholders and developed by your team at Fusion Garage with no formal contract in place with Arrington/TechCrunch.

The dialogue that we have been having feels like you are saying that Fusion Garage should do all the work, the shareholders should assume all risk, then you merge the company and Arrington/TechCrunch hold substantially more shares than the original investors? Given their lack of formal commitment to the development of this device, we feel that it is not for them to dictate terms. Why would we grant them a controlling stake in the company when they have invested nothing and have contributed nothing tangible?

I am not disputing that Arrington and TechCrunch do have some value. However, I am disputing the pricing of this value. I am prepared, along with my two friends, to invest at the 10 million pre-money. This is because we recognize the potential of what Fusion Garage is developing. However, at that valuation and by giving up control to Arrington and team, you are suggesting that they are bringing a value of 5 million to the table. Marketing valued at 5 million? You could get so much more value for the buck if you were to spend that kind money for marketing in other ways.

I appreciate that you respect Arrington and value his friendship, but from my perspective the agreement that you have presented to me demonstrates that he is looking after his own interests. I, along with your other shareholders, look to you to protect our interests. Because of this, we are rejecting the deal that you have presented to us outright. If you decide to proceed with this deal as it was presented to us, I will not co-invest resulting in the two new investors pulling out as well.

We still acknowledge that Arrington and TechCrunch bring some value to your business endeavor. If you would like to continue the relationship with Arrington/TechCrunch, I am proposing that we structure the deal differently. We would grant share options in Fusion Garage to Arrington and team, not to exceed a total of 10 % of the enlarged capital of the company. The percentage would be non-negotiable.

If he agrees to our terms, we would have Arrington assume the role of visionary/evangelist/marketing head and Fusion Garage would acquire the rights to use the Crunchpad brand and name. Personally, I don't think the name is all that important but you seem to be somewhat attached to the name.

This option grant would be done before the new round is assumed. This ensures new investors do not get diluted. I understand you are of the opinion that the above proposal may not hold with Arrington, but we are willing to back and invest in Fusion Garage with or without Arrington and Crunchpad. The above proposal has the unequivocal support of the existing shareholders and the new investors.

Collectively, we all agree that time is running out. We strongly believe that we need to launch with or without Arrington/TechCrunch ASAP. The investment is ready and the documents can be signed off quickly allowing you to focus on execution. Hence, I have to emphasize that you need this resolved by the end of this weekend or risk potential investment dissipating.

You are the founder and CEO of Fusion Garage. I trust that you will carry out your fiduciary duty as expected. I am available to meet in Miami tomorrow afternoon. Eric is here as well. Call me when you get into Miami.

Let's discuss in greater detail then.


Bruce